PAUL A. JACKSON *vs.* BUILDING INSPECTOR OF BROCKTON.

Plymouth.   November 9, 1966. — December 8, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Zoning,* Farm, Accessory use.   *Farm.*   *Words,* "Farming," "Accessory uses."

Where it appeared that a city zoning ordinance permitted in a residence district the use of a structure for "farming" and "accessory uses customarily incident" thereto, and excluded from an "accessory use" a use "which by reason of . . . the emission of odor . . . or in any other way is objectionable or detrimental to the residential character . . . [of] the neighborhood," that a large farm in a residence district and other farms in the same general area were conducted as a single farming enterprise, that the proprietor thereof proposed to operate a dehydrating machine, to be housed in a new, remote building on the large

farm, to dry fodder for cattle and to dry manure for fertilizer, and that with appropriate measures objectionable odors from operation of the machine would be negligible, it was held that its operation would be proper with respect to fodder and manure, wherever produced, to be used on the enterprise land and with respect to fodder and manure actually produced on such land in excess of the quantities required for use thereon and so available for sale, but would not be proper with respect to fodder or manure neither produced on such land nor used thereon.

PETITION for a writ of mandamus filed in the Superior Court on February 1, 1965.

The respondent appealed from an order by *Brogna, J.,* for issuance of the writ.

*Floyd H. Gilbert,* City Solicitor, for the respondent.

*Talbot T. Tweedy* for the petitioner.

CUTTER, J. Jackson operates a large farm (the locus) on Linwood Street, Brockton, in a residence district in which under the zoning ordinance, no "structure . . . shall be used . . . except for" uses which include "[f]arming, truck gardening, nurseries or greenhouses," and "[a]ccessory uses customarily incident to the above uses." The term "accessory use" does not include "[a] business outside the building to which it is accessory . . . or which by reason of the appearance of the building or premises, or the *emission of odor,* smoke, dust or noise *or in any other way* is objectionable or detrimental to the residential character . . . [of] the neighborhood, or which involves features in design *not customary* in buildings for the above uses . . ." (emphasis supplied).

The building inspector issued to Jackson a permit dated April 9, 1964, to erect a building for "storage of farm materials — for use on own farm." An inspector of the board of health and the building inspector called on Jackson at the farm on July 16, 1964, and discussed with him the use to which he intended to put the building. The building inspector, by letter dated October 29, 1964, revoked the permit because "the . . . [principal] use for which this building is intended is in fact a violation of the [Brockton] zoning ordinances." This was confirmed on December 2 and 7.

Jackson, after conferences with city officials, appealed from the revocation of the permit. The "appeal was rejected" by the zoning board of appeals. Jackson thereupon filed this petition for a writ of mandamus to require the building inspector to issue a new permit and to refrain from interfering with his use of the farm drying machine hereinafter mentioned. The case was heard on a statement of agreed facts. A judge in the Superior Court ordered the writ to issue. The building inspector appealed.

Jackson proposes to use the building for which the permit is sought to house an Arnold Farm and Ranch Dehydrator or dryer. The machine consists "of a large container into which corn, grain, cranberries, hay, or other edible products as well as manure or other composts can be placed" after which heated air can be "sent through the container" to remove moisture. "Only condensed moisture escapes. In the case of hay, grain, cranberries, and corn, no substantial or offensive odor is given off. Through the use of filters, cocoa compound, and other chemicals, any odor from manure can be disguised or lessened." Edible "feedstuff after passing through the dryer . . . [may] be eaten by livestock, used, or stored without decay . . . . In addition, . . . hay, grain, and other farm crops . . . [harvested] before the crop is ripe . . . [are ripened] immediately through the use of the heated air. The feed . . . resulting from this drying process . . . is more nutritious . . . and increases the milk product . . . while lowering the cost of the feed. In the case of manure or other compost products a fertilizer or soil conditioner is produced." The building is in a remote section of Jackson's farm. "The nearest house . . . is approximately 750 feet away and is separated [from this building] by dense trees and thickets. The appearance of the building is satisfactory for zoning purposes, and there is no apparent objection because of smoke, dust, or noise." Jackson intends to use the dryer (a) to produce edible fodder for his cattle on the locus and on two farms outside of Brockton in which Jackson has an interest, (b) for drying manure from animals on the locus to

make it easier to handle and use as plant food for fodder grown on the locus, (c) for the "sale of the excess . . . products in a coöperative enterprise with farmers in the general area of" the locus, and (d) for "the use of the excess generally as a product of the" locus.

1. The meaning of the relevant, everyday terms used in the ordinance, viz. "[f]arming" and "[a]ccessory uses customarily incident to" farming, is to be determined "according to the common and approved usages of the language." *Moulton* v. *Building Inspector of Milton,* 312 Mass. 195, 198. *Needham* v. *Winslow Nurseries, Inc.* 330 Mass. 95, 99–101. *Kurz* v. *Board of Appeals of No. Reading,* 341 Mass. 110, 112. See annotation, 97 A. L. R. 2d 702. "Farming" has been held to be a more restricted term than "agriculture." See *Lincoln* v. *Murphy,* 314 Mass. 16, 21. Cf. *Fidler* v. *Zoning Bd. of Adjustment,* 408 Pa. 260, 262–265. The definition of "accessory use," already quoted, does not include a business which by the "emission of odor . . . or in any other way is objectionable or detrimental to the residential character . . . [of] the neighborhood." This provision is of significance in construing what the ordinance means by "farming," for it indicates that the element of detriment to the character of the neighborhood is to be taken into account in considering at least what subsidiary uses are permissible as "farming." See the *Moulton* case, 312 Mass. 195, 197–198.

Certain dairy operations have been recognized as constituting farming. See the *Moulton* case, 312 Mass. 195, 199; *Deutschmann* v. *Board of Appeals of Canton,* 325 Mass. 297, 299–301, which held that the sale as ice cream of dairy products raised on the premises was within a zoning by-law permitting certain sales on farm premises. See also *Kimball* v. *Blanchard,* 90 N. H. 298, 300–301. Compare forms of activity held not to be within the concept of farming, *Lincoln* v. *Murphy,* 314 Mass. 16, 20–21 (piggery); *Mioduszewski* v. *Saugus,* 337 Mass. 140, 143–145 (raising greyhounds). Cf. also *Fidler* v. *Zoning Bd. of Adjustment,* 408 Pa. 260 ("agriculture" held to include large turkey farm). We as-

sume (see the *Deutschmann* case at p. 298) that the appropriate and reasonable use of "modern equipment for farming" will not prevent a dairy operation from being a farm. The cases already cited and the provisions of the ordinance lead to the conclusion that the propriety of treating the operation of the dehydrating machine as "farming" depends upon (a) whether particular proposed uses of it are of a character ordinarily and reasonably regarded as farming, and (b) whether such of the proposed uses as are subsidiary or accessory to the dairy are detrimental to the residential character of the area.

2. Jackson proposes dehydration of fodder material, wherever produced, and manure for use upon the locus and upon land near the locus (in the same general area) which is in fact operated and controlled by him as part of the same general enterprise. For convenience, such land in the area (including the locus) is hereafter referred to as the "area enterprise land." Jackson also proposes to dehydrate such fodder materials and manure for general sale of the dried products either directly or through a farm coöperative, or for use on any land in which he has an interest wherever situated.

We construe the Brockton ordinance (see the *Moulton* case, 312 Mass. 195, 197–199, where the operator of a farm had arrangements with about 200 property owners in a single town for the use of their parcels "for pasturing cattle and for growing" fodder) to permit the operation together of a number of farms within the same general area, if the farms are controlled and operated by the same person as part of the same general enterprise. The operation together by the same person of widely scattered farms in several communities is likely to present a somewhat different situation. If Jackson's machine should be used for dehydration of fodder materials for use (a) on land unreasonably distant from the locus or (b) on nearby land not controlled and operated by Jackson, the dehydration would have some of the aspects of manufacturing rather than farming in its effect on the community.

We recognize that it was said in the *Moulton* case (at p. 199), in speaking of a silo used for the produce of a great many farms in the same enterprise, "The character of the use of the silo as being agricultural or otherwise is in no way affected by the concentration or dispersion of the parcels of land upon which the fodder is grown or by their nearness or distance." This court was then dealing with a bylaw which permitted "agricultural" use, which (as has been noted above) is a broader term than "farming." It was also dealing with a silo, described in the opinion (p. 198) as "a part of the regular equipment of most farms that support any considerable amount of stock and . . . an important instrument in the ordinary process of husbandry." The dehydrator is a specialized and somewhat complicated mechanism. We would not view as "farming" use of the machine to dry farm products apart from any farming operation. We think that it is only when dehydration has reasonably direct relation to farming operations of its owner that it can be regarded as in any sense "farming." See *Needham* v. *Winslow Nurseries, Inc.* 330 Mass. 95, 102–103 (holding that use of the soil sterilization plant there discussed, "if limited to improving the soil of the nursery, is a permissible accessory use," and that the "right to sell the sterilized soil is subject to the restrictions [under the bylaw there considered] which apply to the sale of fertilizers and chemicals")

We regard it as proper, under the Brockton ordinance, for Jackson to dehydrate fodder materials, wherever grown, for actual consumption on Jackson's area enterprise land. This is a reasonable method of obtaining food for the cattle on that land. Similarly, if, on occasion, fodder in excess of the needs of the area enterprise land is produced there, it would be a reasonable incident of the farming enterprise to dehydrate this excess product of the land and to sell it. If it be material, the record reveals no detrimental consequences of dehydration of fodder.

The use on the area enterprise land as fertilizer of raw manure produced there would seem to be a usual method of

farming. The importation of manure or other fertilizer for use on that land would also seem usual. In the absence of any showing on this record that dehydration of manure, wherever produced, for use on the area enterprise land is more detrimental to the residential area than the use of the raw manure, we cannot say that dehydration for such use is not "farming" or a reasonable activity accessory to or incidental to farming. See *Gaspari* v. *Muhlenberg Township Bd. of Adjustment,* 392 Pa. 7, 12–16. See also the *Winslow Nurseries, Inc.* case 330 Mass. 95, 102–103.

Dehydration of fodder or manure which is neither (a) raised upon the area enterprise land, nor (b) intended for use there, seems to us to be outside the scope of what is reasonably comprised in the term "farming," as used in the Brockton ordinance. Dehydration of such fodder and manure, from Brockton's standpoint, is far more related to manufacturing than it is to farming. Doubtless, this view depends upon the answers to questions of degree, but we conclude that such dehydration has no reasonable or necessary relation to farming on the area enterprise land. It also has no necessary relation to the usual concept of farming and accessory farming uses, except to afford an extra volume of materials to lower the per unit cost of operating the machine. We think that such dehydration is properly to be regarded as manufacturing.

We take a different view of dehydration for general sale of either fodder materials or manure actually produced on the area enterprise land in excess of the amounts needed for use on that land. The agreed facts suggest little likelihood of such excess production of fodder, for the enterprise appears to consume more fodder than it produces. If, however, there is any such excess production, Jackson may dehydrate the excess as a farm vegetable product of the land itself. The dehydration of excess manure produced on the land seems to us to stand on the same basis as the fodder there produced. It is an unavoidable product of a permitted farming operation. It has value and that value may be realized by sale. The raw manure could properly be

sold as a farm product. Dehydrating it has not been shown to be more detrimental to the community than the storage and sale of the raw manure. We construe the ordinance as permitting the dehydration and general sale of excess fodder and manure actually produced on the area enterprise land. Although, in speaking of the dehydration of manure produced on the land, we are dealing with a more disagreeable process and product, the situation is in some degree analogous to the manufacture of ice cream made from milk produced on the farm discussed in the *Deutschmann* case, 325 Mass. 297, 300.

3. Jackson is entitled to an appropriately limited permit. The order for judgment, however, is too broad and is reversed. A new order for judgment is to be entered commanding the building inspector to issue a permit restricting, in a manner consistent with this opinion, the use of the dehydrator to the dehydration of (a) fodder and manure for actual use on the area enterprise land, and (b) fodder and manure actually produced on the area enterprise land in excess of the quantities required for use on that land.

*So ordered.*