THE ATTORNEY GENERAL, Petitioner, *v.* THE STATE BOARD OF JUDGES, Respondents.

Statutory Construction.—The second section of the Act of 1868, "For the encouragement of silk culture," shows that the Act of 1866, on the same subject, was not repealed for all purposes; but so much of it was left in force as was for the benefit of those who had, at the time of the passage of the Act of 1868, already planted mulberry trees under the encouragement of the Act of 1866.

Idem.—By the Act of 1866, it was the intention of the Legislature to give for each *farm* or *assemblage* of mulberry trees, of the age of two years—amounting to five thousand or more—a premium of two hundred and fifty dollars.

Idem.—Under that Act, the State Board of Judges had no jurisdiction to allow a premium for a *half* of a plantation; or to subdivide a plantation, and denominate each subdivision a plantation, and award a premium therefor.

In this case, original proceedings were instituted before the Supreme Court by petition, on the part of the Attorney General, in behalf of the People of the State, for a writ of *certiorari*, to review the action of "the State Board of Judges," in awarding certain premiums therein complained of, and which, it was alleged, were in excess of their jurisdiction, because the Board of Judges had proceeded under the Act of 1866, which, it was contended, was repealed by an Act of 1868; and because—in making their awards, they had adopted a wrong interpretation of the expression, "each plantation of five thousand mulberry trees," used in the Statute of 1866. (Acts of 1866, p. 660; Acts of 1868, p. 699.)

It appeared from the minutes of the proceedings of the Board of Judges, set forth in the petition, that the following awards were made:

| To I. N. Hoag, | 24½ | Plantations, | $6,125 | 00 |
|---|---|---|---|---|
| C. W. Reed, | 15½ | " | 3,875 | 00 |
| A. P. Smith, | 4 | " | 1,000 | 00 |
| John Smith, | 2 | " | 500 | 00 |
| Wm. N. Haynie, | 12 | " | 3,000 | 00 |
| E. F. Aiken, | 1½ | " | 375 | 00 |
| J. T. Harbison, | 1 | " | 250 | 00 |

*The Attorney General*, for the Petitioner, contended:

That in the question of fractions of plantations for which there are no provisions in the law, the Board of Judges exceeded its jurisdiction. It does not appear upon the proceedings certified, but I state it as a fact, that Hoag, who claims and was allowed twenty-four and a half plantations, has really but two plantations; Reed, who claims and is allowed fifteen and a half plantations, has only, in fact, one; Haynie, who claims and is allowed twelve plantations, has only one, etc.

The Board, I think, forgot that the State, in offering these premiums, intended them as a healthful *aid* to the enterprise, and never intended to make it a speculation to be paid for by the State in the matter of raising the mulberry tree; it was an encouragement intended, and not a matter of lucre to those who, I think, take an erroneous view of the law itself.

*Edgerton & Poorman,* and *Beatty & Denson,* for Respondents and Claimants.

The law of 1868, after providing, in Section 1, for a different rate of premiums on silk culture from that offered in the law of 1866, provides as follows:

" SEC. 2. Any person or persons hereafter claiming a premium under the provisions of an Act entitled 'An Act for the encouragement of silk culture in California,' approved April second, eighteen hundred and sixty-six, shall be and are hereby excluded and debarred from receiving any premium under the provisions of this Act; and no person claim-

ing under this Act shall be entitled to or receive any premium under the said Act of eighteen hundred and sixty-six."

We submit, as a rule of interpretation, that effect must be given, if possible, to every part and portion of a statute. (*Pennington* v. *Coxe*, 2 Cranch, 33 ; 22 Pick. 571 ; *Burr* v. *Dana*, 22 Cal. 11; *People* v. *Waterman*, 31 Cal. 412.)

And, as another rule of interpretation, we submit that the intent of the Legislature is to govern; not any secret intent, but what the Legislature intended to express, and did express, by the language used. (Bac. Abr. Vol. 9, title Statute, p. 246, ed. of 1861; *McGarrahan* v. *Maxwell*, 28 Cal. 75; *Leese* v. *Clark*, 20 Cal. 387.)

Now, if the language used "*Any person or persons hereafter claiming*," etc., is not a positive and direct recognition of the fact that rights might have accrued under the law which was about being repealed, as well as an expression of determination to save those rights, then we must confess that we fail to perceive any meaning in that clause ; and it becomes a senseless jingle of words.

If the Legislature did not recognize such rights in those who had complied with the law, why should they say, "*And no person claiming under this Act shall be entitled to receive any premium under said Act of eighteen hundred and sixty-six ?* '

If the Legislature intended to absolutely repeal the Act of 1866, and to repudiate all claims against the State under that law, most assuredly a very unhappy selection of language was made to convey that intent.

If such meaning had been intended, Sec. 2 would have contained but two lines, and they the last two of the section —leaving out the words "claiming under this Act"—and then when the Legislature said, "*And no person* * * * shall be entitled to or receive any premium under said Act of eighteen hundred and sixty-six," no room for doubt as to the meaning and intent would have been left. And the very fact that the Legislature did not say so, is a sufficient argument that they did not so intend.

But it may be said that the repealing section is subsequent to Section 2, and must, therefore, prevail. To this we reply, there is no subsequent portion ; it is all passed at one and

the same time,. and is a whole—and the Courts will construe the whole law together, and gather from every word used the meaning of the whole law. (See 1 Blackstone's Com. 89; _Holbrook_ v. _Holbrook_, 1 Pick. 248; _Ex parte Ellis_, 11 Cal. 222, and cases above cited.)

The only natural and rational conclusion to be deduced from the several Acts in question is, that the Legislature of 1866 desired to offer bounties to foster a new industry, but knowing almost nothing about the business, could not prescribe particular rules as to planting trees—could not even require them to be planted in suitable form for silk culture, because that form was a part of the experiment.

The only thing that could be done was to offer sufficient inducements, in a general way, to secure the desired experiments—and this was done. In 1868 the Legislature had the benefit of the experiments already made and in progress; the press of the State had teemed with articles and communications giving information upon the subject; so that the Legislature then in session was enabled to pass what was supposed a better and more cautious law.

How does the petitioner know, and how can this Court know, that the plantations of these claimants are divided by mere imaginary lines, or that the claimants have only one or two each? There is nothing in the record to show it. The Board of Judges have passed upon the facts, and found in favor of the claimants. Fractions of plantations are expressly provided for and allowed. The law of 1866 especially refers to an Act providing for fractions. (See Stats. 1866, p. 661, Sec. 2; Stats. 1863, p. 765, Sec. 1.)

Petitioner argues that the Board of Judges had no jurisdiction to act under a repealed law. We answer: The Board of Judges acted under the law of 1862, which organized the Board and imposed its duties; and if the Board even had been too liberal, in allowing more than was contemplated by law (which we deny), it was not an excess of jurisdiction, but merely an erroneous conclusion. The Board certainly has jurisdiction of the _subject-matter_, and did not go out of that jurisdiction.

The Board of Judges is as independent, within its own

sphere, as any other power; and this Court will only interfere when the lines of that jurisdiction are transcended.

RHODES, J., delivered the opinion of the Court:

We agree with respondents, that, although there is in the Act of 1868, for the encouragement of silk culture, a section repealing the Act of 1866 in relation to the same subject, the second section of the Act of 1868, providing that persons may claim premiums under the Act of 1866, and forbidding those claiming premiums under either Act from claiming under the other Act also, shows that the Act of 1866 was not repealed for all purposes. It was, in our opinion, left in force for the benefit of all those who had, at the time of the passage of the Act of 1868, already planted mulberry trees under the encouragement offered by the Act of 1866.

The question of the greatest importance in the case is, whether a parcel of land which is planted in mulberry trees can be subdivided by imaginary lines, so that each subdivision shall constitute a *plantation*, within the meaning of the Act of 1866. The decision of this question, we shall assume, is desirable and important, not only to the State, but also to the State Board of Judges and the claimants; for the claimants would not desire to receive, nor the Board of Judges to award, premiums that had not been earned in accordance with the provisions of the statute. We are of the opinion that the manner in which the premiums have been awarded presents an opportunity for the decision of the question.

The statute offers a premium of $250 for "each plantation of five thousand mulberry trees of the age of two years." A plantation is "a place planted; land brought under cultivation; ground occupied by trees or vegetables which have been planted; especially, in the United States and West Indies, a large estate, cultivated chiefly by negroes, either slaves or free, who live, in a distinct community, on the estate, under the control of the proprietor or master." (Webster's Dictionary.) Bouvier, after saying that the term is applicable to the English Colonies in America, defines it as a *farm*. A cotton or sugar plantation is an estate or farm

devoted to the cultivation of cotton or sugar. Its ordinary signification is a farm, and those terms are nearly synonymous. The Legislature adopted that term, for the want of a better one, to express the idea of a parcel of land devoted to the cultivation and growth of mulberry trees. The term *orchard* is not applicable, for that signifies an enclosure or assemblage of fruit or nut-bearing trees ; nor would *nursery* express the meaning of the Legislature, for the well known signification of the word, as used in this State in respect to horticulture, is a place where young trees are propagated for the purpose of being transplanted into orchards, plantations, etc. The intention of the Legislature, as we construe the Act, was to give for each *farm* or *assemblage* of mulberry trees of the age of two years, amounting to five thousand or more, a premium of $250. Had it been intended to give a premium for *each five thousand trees,* such would have been the language of the Act, and the interposition of the word "plantation" would have been useless—for it would neither qualify, explain nor limit the other words. But that word was inserted, it must be presumed, for some sensible purpose, and none can be assigned to it if the cultivator was entitled to as many premiums of $250, as there were multiples of five thousand trees growing upon his farm.

The force of this construction is not impaired by the Act of 1863, the "conditions and requirements" of which, and of the Act of 1862 were made applicable to the Act of 1866. The Act of 1863 provides that "*any person* producing or manufacturing any one of the articles or things named in the Act to which this Act is supplemental [the Act of 1862], in one fourth or one half the *quantity* named therein    *    * shall be entitled to one fourth or one half of the premium," etc. According to this provision, the person "*producing*" a plantation of twelve hundred and fifty mulberry trees would be entitled to one quarter of the premium granted by the Act of 1863, and the person "producing" a plantation of twenty-five hundred mulberry trees would be entitled to one half of such premium. But, whether the number of trees grown upon the same farm or parcel of land amounted to twelve hundred and fifty, or twenty-five hundred, or five

thousand, or more than five thousand, the land with the growing trees constituted *one "plantation* of mulberry trees." The premium offered by the Act of 1866 was $250 for a plantation of five thousand mulberry trees, and also, as modified by the Act of 1866, $125 for a plantation of twenty-five hundred mulberry trees, and $62 50 for a plantation of twelve hundred and fifty mulberry trees; and not a premium for mulberry trees generally at the rate of five cents each, or five dollars per hundred, or fifty dollars per thousand, or two hundred and fifty dollars per five thousand. The Act of 1866 was dictated by the same policy as the Act of 1862, and many of the provisions of the latter Act strengthen this view. Take, for instance, the provision in relation to cotton : "For the first plantation of cotton, of not less than ten acres in bearing, of good staple, $1,000; for the first fifty acres of cotton, in bearing, of good staple, $2,000; for the first one hundred acres of cotton, in bearing, of good staple, $3,000." (p. 418.) The word plantation is not repeated before each parcel of land mentioned, but it is evident that either of those parcels planted in cotton was considered as a "plantation of cotton." For if this were not so, it is evident that the person having a tract of one hundred acres in cotton would not be limited to a premium of $3,000, provided for "the first one hundred acres of cotton ;" but he might divide his one hundred acres by imaginary lines, or by furrows or stakes, into *ten* plantations, and he would then be entitled to $1,000 for each plantation—that is, $10,000 for his one hundred acres, instead of $3,000, as provided by the Act. It is scarcely necessary to say that the Legislature could not have contemplated such an operation, or such a result.

The correctness of the opposite construction may be tested by result and consequences—that is to say, if there ever was a case in which their use as a test was allowable, this is preeminently the case. There must be conceded to the members of the Legislature, at least, the average arithmetical capacity, and a proper regard for the welfare of the State. A short calculation will show that it is incredible, that the Legislature should have intended such results, as the subdi-

visions of farms into plantations of mulberry trees will pro-
duce.   A person who, interpreting the statute as authorizing
such subdivision, should plant a quarter section of land in
nursery form, a foot and a half apart, and in rows three feet
apart, might claim three hundred and nine and a half plan-
tations, and premiums thereon, amounting to $77,375.   But
if he had conceived it more in harmony with the interest of
the Act to plant the trees so that they could be devoted to
the production of silk, and had planted them, say, three by
six feet apart, he would have had seventy-seven and a half
plantations, entitling him to premiums amounting to $19,375.
Such liberal bounties, if the statute had been so understood,
would have enlisted, as was intended, the enterprise of many
men, and the first, and the direct result of such stimulated
industry would have been the bankruptcy of the State, by
the creation of a statute debt amounting to millions of dol-
lars—unless the constitutional limitation of $300,000 had
come to the rescue.   It would be unjustifiable to attribute to
the Legislature such an utter disregard of the dictates of
prudence, economy and common honesty, as the passage of
an act with that intent would manifest.

If, then, a plantation of mulberry trees is a farm or tract
of land planted with mulberry trees, whether the trees
amount to five thousand, or multiples of five thousand, or
aliquot parts of five thousand—a proposition upon which we
have not a shadow of doubt—then it must follow, that
neither the claimant nor the State Board of Judges could
devise or get at such a thing as the *half* of a plantation,
except by drawing imaginary lines through a plantation.   A
half of a plantation is not attainable in any other way.   It
would be no more absurd for an exhibitor at the State Fair
to demand a premium for the half of a horse, or a horse and
a half.   There was claimed and there·was awarded by the
Board of Judges, premiums to one claimant for twenty-four
and a half plantations, to another for fifteen and a half plan-
tations, and to another ·for four plantations; to another
for two plantations, to another for twelve plantations, and
to another for one and a half plantations.   The Board
of Judges had no jurisdiction to allow a premium for a

*half* of a plantation, and, what is a matter of much greater moment, they have no jurisdiction to subdivide a plantation, and denominate each subdivision a plantation, and award a premium therefor, and, in that mode, instead of one premium for one plantation, to award many premiums for one plantation. They could not increase the premium indirectly by calling one plantation many plantations. It cannot be ascertained with mathematical certainty that the number of plantations was ascertained in those cases in which premiums were awarded to the respective claimants, for four, two and twelve plantations, by the subdivision process, but when the number of plantations is considered, and, in view of the fact that a subdivision was made in the case of those claiming for fractions of plantations, and the presumption that the Board of Judges gave all the claimants under the Act of 1866, the benefit of the same interpretation, it may be said with a moral certainty, that the number of plantations was obtained by subdividing the plantation of each claimant by imaginary lines.

Our conclusion is, that the true intent and meaning of the Statute of 1866 is, that the owner and cultivator of a farm or plantation, having planted thereon, at proper distances from each other, for the production of foliage for feeding silk worms, not less than five thousand mulberry trees, of the age of two years, is entitled to a premium of $250; and if he has more than one such farm or plantation (they being entirely separate or distinct), he is entitled to such premium for each; and we are, therefore, of opinion, that the Board of Judges, in awarding premiums under the Act of 1866, to each of the claimants in the several amounts mentioned in the record, exceeded their jurisdiction, and that their proceedings and determination in respect to those several claims ought to be reversed, and it is so ordered.